FILED

2022 Oct-18  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel. [UNDER SEAL]** | ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) | **IN CAMERA** |
| | ) | **FILED UNDER SEAL** |
| **v.** | ) | **\*DO NOT FILE IN PACER\*** |
| | ) | |
| **[UNDER SEAL]** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **ex rel. BRENT A. LILLARD** ) | **Civil Action No.** |
| ) | **IN CAMERA** |
| **Plaintiff,** ) | **FILED UNDER SEAL** |
| ) | |
| **v.** ) | |
| ) | |
| **DELL TECHNOLOGIES, INC.** ) | |
| **DELL FEDERAL SYSTEMS, L.P.** ) | |
| ) | |
| **Defendants.** ) | |

**FIRST AMENDED FALSE CLAIMS ACT COMPLAINT**

## I.    INTRODUCTION

1.      Relator Brent A. Lillard ("Relator") brings this action on behalf of the United States against Defendants Dell Technologies, Inc. ("Dell") and Dell Federal Systems, L.P. ("Dell Federal") (collectively, "Defendants") for treble damages and civil penalties arising from the Defendant's false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. Relator brings this action pursuant to 31 U.S.C. § 3730(b) based on Defendants' submission of fraudulent invoices for the supply of Dell products and conspiring with other contractors to submit fraudulent invoices on at least

four government wide acquisition contracts ("GWACs").[1]  These include: (1) the Army Desktop and Mobile Computing-3 ("ADMC3"); (2) the Army Desktop and Mobile Computing-2 ("ADMC2"); (3) Solutions for Enterprise-Wide Procurement ("SEWP") managed by the National Aeronautics and Space Administration ("NASA"); and (4) GSA Schedule 70 Multiple Award Schedule awarded to Defendants and Defendants' Teaming Partners.

2.    GWACs involve the Government awarding contracts to multiple awardees, followed by many discreet delivery orders issued to contract holders throughout the life of the contract.  Competition for information technology GWACs delivery orders is primarily price-based, as standard-configuration computers are generally fungible.  Once awarded, contract holders again compete amongst themselves for delivery orders using pricing controlled by manufacturers, like Defendants.  The Government expected there to be intense price competition at both the contract award and delivery order levels by virtue

---

[1] FAR § 2.101 defines GWAC as: "means a task-order or delivery-order contract for information technology established by one agency for Governmentwide use that is operated-

    (1) By an executive agent designated by the Office of Management and Budget pursuant to 40 U.S.C. 11302(e); or

    (2) Under a delegation of procurement authority issued by the General Services Administration (GSA) prior to August 7,1996, under authority granted GSA by former section 40 U.S.C. 759, repealed by Pub. L. 104-106. The Economy Act does not apply to orders under a Governmentwide acquisition contract.

of having multiple contract holders competing for each delivery order.[2] However, while ultimate proposal and delivery order prices are determined by contract holders, their costs are controlled by a few manufacturers, such as Defendants, who act as major sources of supply for all contract holders. Thus, it is by maximizing the number of manufacturers offering compliant products – and not by the large number of contract holders – that compliance with the full and open competition requirements of the Competition in Contracting Act is achieved.

3.      Unbeknown to the Government, Dell Federal excluded rival products from competitions for information technology products by entering into teaming agreements with many of the GWAC awardees. These agreements offered preferred or discounted pricing in exchange for the awardees' commitment to exclusively offer Dell Federal products, if Dell products were available. Where products were not initially available from Dell Federal but subsequently became available, Dell Federal conditioned such preferred pricing on the awardee's commitment to replace the products of other manufacturers on

---

[2] The four GWAC contracts are multiple award indefinite-delivery ("IDIQ") contracts under FAR Subpart 16.5. Because multiple award IDIQ contracts provide competition on two levels (*e.g.*, initial award and delivery orders), the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 stated: "Not later than one year after the date of the enactment of this Act, the Federal Acquisition Regulation shall be amended to require enhanced competition in the purchase of property and services by all executive agencies pursuant to multiple award contracts." *Id.* at Section 863(a).

its offering list with exclusively Dell products.[3]  These teaming agreements have the effect of removing the products of other manufacturers from being available to the Government and reducing supply options to only the Defendants.  As a result of these teaming agreements, the Government was deprived of the expected competition that would be present if Defendants' Teaming Partners were allowed to offer both Dell-OEM products as well as non-Dell OEM products under the teaming agreements.  This reduced competition allowed Defendants to partially control prices.

4.    As a result of this collusive bidding pursuant to the teaming agreements, Defendants have violated the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; the Sherman Act, 15 U.S.C. § 1; the Clayton Act, 15 U.S.C. § 12-27; Conspiracy to Defraud the United States, 18 U.S.C. § 371; and the Anti-Kickback Act, 41 U.S.C. § 8702.  In addition, Defendants have violated both the Federal Acquisition Regulation and contractual terms of the specified GWACs.

5.    One indicator of the near monopolistic control that the Defendants have over the Federal IT market can be found in the table below, which depicts the leaders in sales of information technology products under GSA Schedule 70 contracts:[4]

---

[3] Product replacement usually comes in response to a scheduled, periodic "technical refresh" allowing contract holders to modify their offerings lists to replace obsolete items.

[4] https://lemonwire.com/2019/05/31/gsa-it-schedule-70-leaders-in-sales-for-q1-fy-2019/

| Company Name | FY 2019, Q1 Sales |
|---|---|
| Dell Federal Systems L.P. | $174,799,632 |
| Carahsoft Technology Corporation | $166,292,093 |
| Cellco Partnership Inc. | $142,871,904 |
| Dell Marketing L.P. | $99,052,717 |
| immixTechnology Inc. | $89,164,576 |
| Four LLC | $87,964,234 |
| Booz Allen Hamilton Inc. | $73,147,425 |
| CDW Government LLC | $71,330,560 |
| Accenture Federal Services LLC | $70,480,721 |
| International Business Machines | $66,125,975 |

In this regard, Carahsoft Technology is a distributor of Dell Products and services.[5]  Similarly, immixTecology, Inc,[6] Four LLC,[7] and CDW[8] are all distributors of Dell products.  The bottom line is that if the sales of the Dell companies are combined with their Teaming Partners, they represent over 66%

---

[5]   "Carahsoft Technology Corp. is the federal government distributor for Dell products and services. We are pleased to manage the Dell Government Agent Program for the entire Dell solutions portfolio to include: Dell, Dell Technologies, Pivotal, RSA, Secureworks and Virtustream." https://www.carahsoft.com/dell#dell-partners
[6]   https://www.immixgroup.com/manufacturers/
[7]   https://www.4points.com/it-solutions-partners/dell-technologies/
[8] CDW-G's website confirms that it is a distributor of Dell Products. https://www.cdwg.com/content/cdwg/en/brand/dell-emc-interstitial.html?enkwrd=DELL&key=DELL

of the sales, thus corroborating the near monopolistic control that the Defendants have over the Federal IT market

6.    The table above provides a strong inference that Dell Federal and Dell Marketing LP have presented for payment invoices in excess of $274,000,000 for GSA schedules in the first quarter of 2019 alone.  Similarly, for GSA schedules in the first quarter of 2019 Defendants' Teaming Partners (*e.g*., Carahsoft Technology, immix Technology, Four LLC, and CDW) presented for payment invoices in excess of $400,000,000.

7.    According to *USASpending.gov*., the Federal government obligated more than $1.13 billion to Dell Federal in 2019 under DUNS 601839660.[9] Another $1.4 billion was obligated to Dell Federal in 2019 alone under DUNS 149530219.[10] On information and belief, most of the money obligated was under GWAC contracts.  This combined $2.53 billion in 2019 alone does not include the money the Federal government obligated when acquiring Dell Products from the Defendants' Teaming Partners.

8.    As demonstrated herein, Defendants have enacted a scheme to reduce government access to competing products by requiring their Teaming Partners to remove competing products in exchange for discounted prices.  This

---

[9]  https://www.usaspending.gov/#/recipient/c12e9d4a-08e8-3f7c-5efc-6850cf1d15ff-P/latest
[10]  https://www.usaspending.gov/#/recipient/f161438b-d68f-2383-7793-839b1cf6d2af-C/latest

practice strongly contributed to their dominance over the federal IT marketplace, through both direct contracts and through Teaming Partners.

## II.   JURISDICTION AND VENUE

9.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345, 28 U.S.C. § 1331, and 28 U.S.C. § 1332.

10.    At all times material to this Complaint, Defendants regularly conducted business within the State of Alabama and certain material actions alleged in this Complaint occurred in Alabama.   Defendants are therefore, subject to personal jurisdiction in Alabama.  For example, under the GWACs identified in paragraph 3, on Redstone Arsenal there are many millions of dollars of Dell Products for which the invoices paid by the Government fall within the allegations of this Complaint.

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business within and the acts of Defendants alleged in this Complaint occurred within this District.

## III.   PARTIES

12.    Relator Brent Lillard is a citizen of the United States over the age of eighteen and a resident of the State of Virginia.  Relator is the original source of

the information underlying this Complaint provided to the United States.  As the Chief Executive Officer of a company that has sold hundreds of millions of dollars of information technology ("IT") products (including Dell Products) to the Federal Government, the Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States as required by the False Claims Act, 31 U.S.C. § 3730(b)(2).  The Relator does not believe any of the information underlying the allegations and transactions in this Complaint has been publicly disclosed.

13.    Defendant Dell Technologies, Inc. ("Dell") is a Delaware Corporation with its principal executive office in Round Rock, Texas.  Dell Technologies, Inc. is a leading global end-to-end technology provider, with a comprehensive portfolio of IT hardware, software and service solutions.  At all times relevant to this action, Defendants were engaged in providing IT hardware, software and service solutions in Alabama.  Dell conspired with its wholly owned subsidiary of Dell Federal Systems, LP to defraud the Government by violating the False Claims Act while seeking to distance itself from the liability for its fraud by using a corporate veil.

14.    Defendant Dell Federal Systems, LP ("Dell Federal") is a wholly owned subsidiary of Dell Technologies, Inc. founded in 1999 to service Federal

markets.  At all times relevant to this action, Dell Federal was engaged in bidding on GWACs in Alabama.

## IV.    THE FALSE CLAIMS ACT

15.    The FCA imposes liability upon any person who: (a) "knowingly presents or causes to be presented [to the government] a false or fraudulent claim for payment or approval"; or (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(A) and (B), as amended.

16.    The FCA imposes liability not only for intentionally false or fraudulent conduct, but also where an individual "acts in deliberate ignorance of the truth or falsity of the information" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l)(A)(ii) or (iii).

17.    The FCA defines claim as (A) "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

18.    The FCA defines material as "having a natural tendency to influence or be capable of influencing the payment or receipt of property or money." 31 U.S.C. § 3729(b)(4).

19.    This action is partially based on implied false certifications in that, Dell Federal and its Teaming Partners submitted invoices for Dell Products under the GWACs without the Government being aware of their intention to eliminate non-Dell products from the competition. Defendants impliedly certified in their requests for payments that they did not engage in any behavior to unfairly eliminate competition in the bidding process on the GWACs.

20.    In *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, the U.S. Supreme Court declared a two-part test for FCA actions based on implied false certifications:

A.    First Escobar Criteria: "the claim does not merely request payment, but also makes specific representations about the goods or services provided…" For the GWACs, any non-OEM awardees who signed a Dell Federal teaming agreement with the product replacement clause have denied the Government of a key aspect of competition it expected, surreptitiously eroding the effectiveness of the competition at both the contract and delivery order levels.    Moreover, there is an implied

11

representation by submitters that they have complied with the mandatory clause in Federal Acquisition Regulation ("FAR") § 52.244-5 to select subcontractors "on a competitive basis to the maximum practical extent."

B.    Second Escobar Criteria: "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  Here, the Defendants failed to disclose their collusive bidding which violated the following statutes: Sherman Act, 15 U.S.C. § 1; the Clayton Act, 15 U.S.C. § 12-27; and Conspiracy to Defraud the United States, 18 U.S.C. § 371.  Moreover, Defendants failed to disclose breaches of FAR § 52.244-5, FAR § 44.201-1(b), and the technology refreshment clause. As discussed below, Defendants also failed to disclose their noncompliance with Sherman Act, 15 U.S.C. § 2, through their attempted monopolization of the market for Federal IT "reserves" award GWACs.

## V.    FACTUAL ALLEGATIONS

### A.    The GWACs

21.    The Government has awarded GWACs to multiple awardees, followed by many discrete delivery orders issued to contract holders throughout the life of the contract.  As stated above, competition for these contracts is primarily price-based, as standard-configuration computers which are generally fungible.  Once awarded, contract holders again compete among themselves for delivery orders using pricing

based on supply costs controlled by manufacturers like Defendants.[11]

22.    The Government expected there to be intense price competition on the GWACs at both the contract award and delivery order levels by virtue of having multiple contract holders competing for each delivery order.  However, while ultimate proposal and delivery order prices are determined by contract holders, their costs are controlled by a few manufacturers like Defendants who act as major sources of supply for all contract holders.  Thus, it is maximizing the number of manufacturers offering compliant products – not the large number of contract holders - that is critical to the existence of full and open competition in these contracts.

23.    Dell Federal excluded competing products from these competitions by entering into teaming agreements with many of the GWAC awardees.  These agreements offered preferred or discounted pricing in exchange for the awardees' commitment to exclusively offer Dell Federal products if available.  Where products were not initially available from Dell Federal but subsequently became available, Dell Federal conditioned such pricing on the awardee's commitment to replace the products of other manufacturers on its offering list with exclusively Dell products.

---

[11] Examples of GWACs for Dell Products not mentioned elsewhere in this complaint but upon reason and belief are subject to the same misconduct set forth in Counts I-VIII are the Air Force's NetCents 1 and 2; GSA's STARS II & III; the Navy's SeaPort Next Generation; and the Army's ITES family of contracts. Moreover, on information and belief, the vast majority of sales of Dell Products to the United States Government through third party distributors have been made under the Teaming Agreements that closely resemble those in Exhibits 1 and 3.

These agreements have the effect of removing the products of other manufacturers from being available to the Government and consolidating supply options to only Dell Federal.

24.    As a result of these teaming agreements, the Government was deprived of the expected competition that would be present if the contractors are allowed to offer both Dell-OEM products as well as non-Dell OEM products under the teaming agreements.  This reduced competition allows Defendants to partially control prices as a result of diminished competition.

25.    An analysis of Government obligations on ADMC-2[12] reveals that the scheme works to consolidate Dell's market power.  Dell Federal accounts for over 39% of obligations (over $2.1B), and the second-highest recipient was CDW-G, a Dell Computer Reseller, with 20% (over $1B).  By contrast, Dell's nearest peer competitor, Hewlett-Packard, received only 12% across its two entities, HP Inc. and HP Federal, accounting for $669M, despite the fact that HP offers a full product line that meets all relevant specifications for sale under these contracts.

26.    False claims were actually presented for payment as evinced from the graph below depicting total obligated amounts by contractor for the ADMC2 GWAC:

---

[12] https://govtribe.com/award/federal-vehicle/army-desktop-and-mobile-computing-2-admc-2#task-order-distribution

14

Task Order Distribution



The above graph was compiled by GovTribe, an industry leader in providing market information to Government contractors.[13]  The graph is a reliable indicia that claims were actually submitted by Dell Federal and Defendants' Teaming Partners. Shown in Exhibit 2, orders awarded to Dell Federal Systems account for more obligated funds than any other AMDC2 contractor.  As a result of the teaming agreements, Defendants were able to diminish the availability of products from rival OEMs, thus reducing competition.  The reduced competition allowed Defendants to

---

[13]  https://govtribe.com/award/federal-vehicle/army-desktop-and-mobile-computing-2-admc-2

quote higher prices for Dell products than would otherwise had been quoted but for the reduced competition.

**B.    ADMC-3**

27.    On or about May 3, 2016, the Army issued the ADMC3 Solicitation. Award selections were first made in February 2017, but twenty-one protests resulted in corrective action which delayed the program.

28.    The nearly thirty-month delay between the initial award and the suspensions from protests resulted in many IT products on the awardee's contracts becoming obsolete.  As a result, the obsolete IT products are replaced by promptly implemented technology refreshments on the ADMC3.[14]  The ADMC3 solicitation, as well as the other GWACs, permit periodic technology refreshment with clauses similar to the below ADMC-3 Statement of Work (SOW) clause[15]:

*Technology Refreshment*

> New Army technology requirements, any new functionality not available on the contract that can be determined to be within the general scope of the contract, <u>shall be introduced once every 12 months</u>, starting with CB-4 and every third CB cycle thereafter (e.g., CB-7, CB-10, CB-13, etc.). . . . Contractors shall have the opportunity to <u>refresh product offerings</u>, opportunity to update product offerings to reflect the latest innovation(s)/technology  and/or  address  the  CB  specification

---

[14] In June 2020, the Army issued new IT equipment standards for the ADMC2 contract, requiring all contract holders to update their catalogs.  Many of these specifications are more advanced than the solicitation specifications for the ADMC3 competition.  Upon reason and belief, the ADMC3 contract holders will therefore be required to update their catalogs prior to the first purchase on ADMC3, triggering the elimination of competing products in favor of Dell even before the first delivery order.

[15] Consolidated Buys (CBs) are four-month periods during which offerings and prices remain constant.

requirements, at or below established ceiling prices for the other two CB periods should they choose.

ADMC3 SOW (13 December 2018) at p. 7 (emphasis added).

Additionally, the ADMC3 contract contains specific technology refreshment guidelines requiring contractors to update their offerings prior to the start of each program year starting with year two, as described in the ADMC3 SOW[16]:

> … During CB-1 cycle, and every third CB cycle thereafter (e.g., CB-4, CB-7, CB-10, etc.), the complete product offering of the ADMC-3 contract shall be offered. Product offerings during these CB periods shall establish the vendor's ceiling prices for each product category and will be enforced the remainder of the year (i.e., next two CB periods)….

Id.

29.    Below are extracts from the Dell Federal draft Teaming Agreement provided to potential Partners wishing to sell Dell Products on the ADMC3 contract, version dated May 20, 2016:

---

I.    Exclusivity:

a.  Prime

i. Proposal Phase. Solely in response to the Solicitation, including any amendments thereto, and subject to the termination provisions in Section 3 above, Prime agrees
    (1) Not to participate in other Program proposal undertakings competitive to the Team's effort; and
    (2) For initial Solicitation Proposal submission only, CLINS

---

[16] ADMC3 SOW, dated 22 April 2016, para. 1.2.2, at p. 7.  Prior to the beginning of the second program year (CB-4), vendors must update "the complete product offering," including products and prices.

> may be bid with any Original Equipment Manufacturer ("OEM")'s product, even where a Dell Product meets the Solicitation's technical and reasonable delivery requirements ("Dell Compliant Solution").
>
> ii. Program Contract Performance. In the event Prime is awarded a Program Contract, during the term of said Program Contract including all Army Consolidated Buy ("CB") periods through the life of the Program Contract (CB-1 through CB-30) for all CLINs where Prime bid a Dell Compliant Solution on initial Solicitation Proposal and beginning in CB-4 for all CLINs where Prime bid another OEM on initial Solicitation, and any extensions thereof (CB-31 forward through the extended Program Contract life), for Program Contract CLINS where there is a Dell Compliant Solution available, Prime shall:
>
> > (1) Exclusively offer Dell Compliant Solutions same for sale under said CLINS for each Consolidated Buy bid period, inclusive of new Contract CLINS or modifications. In the event Dell does not have a Dell Compliant Solution, Prime may offer for sale and/or sell a competing product(s) during the time there is no Dell Compliant Solution available. **In the event a Dell Compliant Solution subsequently becomes available, Prime agrees to cease offering the competing product for sale and offer only Dell Compliant Solutions at the first allowable opportunity**….

Exhibit 1. (emphasis added).

30.    In exchange for signing the above Teaming Agreement, Defendants committed to provide special program pricing to enable the Teaming Partner to be more competitive on delivery order competitions.   This reduced pricing was contingent upon the agreement to sell exclusively Dell products as specified in a later portion of the Teaming Agreement:

> II.    Responsibilities of the Parties
>
> a. Proposal Preparation and life of the Program as set forth below.
>
> i. Prime. As set forth on Attachment A.
>
> ii. Dell. In addition to Dell's responsibilities set forth in Attachment A, <u>Dell shall offer Prime Program-preferred pricing for Dell Products in support of Prime's Proposal and life of the Program</u>. Such Program-preferred pricing will be included as a separate Pricing Attachment. Program-preferred pricing is granted by Dell **as consideration for Prime's express agreement to bid Dell Compliant Solutions exclusively** upon contract award. In the event Prime bids competing products AND a Dell Compliant Solution was available, notwithstanding the fact that Prime's bid included Dell's Program-preferred pricing, **Dell's Program-preferred pricing is void** and shall revert to the standard discount table pricing available to Prime through its Dell Federal Reseller agreement, if any; if no such agreement exists, then Dell pricing reverts to standard Dell U.S. Federal Partner Direct pricing. In such an event, Prime expressly agrees it has no standing to raise a detrimental reliance claim against Dell.

Exhibit 1. (emphasis added).

    31.    Upon information and belief, Defendants' Teaming Partners signed Teaming Agreements similar to the one in Exhibit 1 since it was only by signing such an agreement that the Teaming Partner would be provided with discounts to Dell Products.  Without such discounts, the Teaming Partner would not have been able to be price-competitive to win delivery orders on ADMC3.[17] Defendants' Teaming Partners had little or no leverage to negotiate the teaming

---

[17]    The same observation that without such discounts, a distributor of Dell Products would not have been price-competitive to win delivery orders is equally applicable to other GWAC contracts.

agreements since Defendants had near monopolistic control over the commercial sales of IT to federal agencies.

32.    The vast gap in bargaining power rendered the Teaming Partners as victims of Defendants to a certain degree in that, even though the Teaming Partners submitted false claims for payment on the ADMC3 as a result of signing the Teaming Agreements, Defendants caused them to submit false claims by using their monopolistic power to eliminate any negotiating on the part of the Teaming Partners in signing the Teaming Agreements.

33.    Among the Defendants' Teaming Partners for the ADMC3 are:

a.    Blue Technologies, Inc., 5885 Grant Avenue, Cleveland, OH 44105.[18]

b.    Iron Bow Technologies, Inc., 2303 Dulles Station Boulevard, Suite 400, Herndon, VA 20171.[19]

c.    Strategic Communications, Inc., 310 Evergreen Road, Louisville, KY 40243.[20]

34.    Under the Teaming Agreements between Dell Federal and other

---

[18]For a link to Blue Technologies' web site showing it is a "partner" with Dell see
https://bluetech.com/partners/
[19] For a link to Iron Bow Technologies' web site showing Dell is a strategic partner, see
https://ironbow.com/strategic-partners/
[20] For a link to Strategic Communication's web site showing Dell as a strategic partner, see
https://yourstrategic.com/strategic-partners/

ADMC3 awardees who were Defendants' Teaming Partners, the Defendants' Teaming Partners were allowed to initially offer the products of Dell's competitors. However, under the exclusivity clause, Defendants' Teaming Partners were required to switch to Dell products in the technology refreshments if Dell provided compliant products. This restriction on offering competitor products imposed by Defendants deprived the Government of a significant measure of competition the Government assumed would be present at the delivery order acquisition stage, fraudulently causing the Government to believe the competition had achieved a higher level of available product diversity than was actually the case.

35.    The Defendants have unlawfully reduced competition in ADMC3 by using Teaming Agreements which precluded the IT products of rival manufacturers. The reduced competition allowed Defendants to quote higher prices for Dell Products than would otherwise have been quoted but for the reduced competition.

36.    Because Defendants concealed the Teaming Agreements from the ADMC3 contracting officer, the contracting officer was and remains unaware that the amount of competition for ADMC3 deliver orders is significantly less than the Government expected.

37.    For the ADMC3 delivery orders placed against the Dell Federal prime contract, the location of the false or fraudulent conduct was the Dell Federal's invoicing department where the invoices were sent to the Government.  For the

ADMC3 delivery orders placed against the contracts of the Defendants' Teaming Partners, the location of the false or fraudulent act was at the address for the Teaming Partner.

38.    The violations set forth in Counts I – VIII as to the ADMC3 contracts occurred during the life of the contracts which commenced with agencies placing delivery orders beginning in 2020 and continuing at this time.

39.    The predicted value of ADMC3 is $2.5 billion.[21]

**C.    ADMC2**

40.    On or about October 21, 2005, the Army issued solicitation W91QUZ-05-R-0011 for ADMC2.  ADMC2 is a GWAC for commercial-off-the-shelf IT hardware, including desktop computers, workstations, notebooks, and printers. The RFP contemplated award of multiple indefinite-delivery, indefinite-quantity contracts, under which task orders would be competed.

41.    Upon information and belief, Defendants' Teaming Partners signed Teaming Agreements similar to the one in Exhibit 1.  Using its monopolistic power, the Teaming Partners were coerced to sign such agreements since it was the only way to obtain Dell's Program-preferred pricing which allowed the Teaming Partner to be price competitive for sells on ADMC2.  For example, one of the Teaming

---

[21]   https://www.govconwire.com/2017/02/army-awards-9-spots-on-2-5b-desktop-mobile-computers-contract-vehicle/

Partners, Emtec Federal, Inc., was awarded one order for Dell OptiPlex Computers for $852,558.59 on March 9, 2016.  This would have been impossible if Emtec Federal, Inc. had not signed the Teaming Agreement that Dell Federal had in place for ADMC2.  The Teaming Partners had little or no leverage to negotiate the teaming agreements since Defendants had near monopolistic control over the commercial sales of IT to federal agencies.  The vast gap in bargaining power rendered the Teaming Partners as victims of Defendants to a certain degree in that, even though the Teaming Partners submitted false claims for payment on the ADMC2 as a result of signing the Teaming Agreements, Defendants caused them to submit false claims by using their monopolistic power to eliminate any negotiating on the part of the Teaming Partners in signing the Teaming Agreements.

42.    Among the Defendants' Teaming Partners for the ADMC2 are:

a.    CDW-G Corporation, 200 N. Milwaukee, Avenue, Vernon Hills, IL 60061.[22]

b.    Telos Corporation, 19886 Ashburn Road, Virginia 20147.[23]

c.    Transource Computers, 2405 West Utopia Road, Phoenix, Arizona, 85027.[24]

---

[22] CDW-G's website confirms that it is a distributor of Dell Products.
https://www.cdwg.com/content/cdwg/en/brand/dell-emc-interstitial.html?enkwrd=DELL&key=DELL
[23] Telos' website confirms that it is a distributor of Dell Products.
https://www.telos.com/company/partners/
[24] The Transource Computer's website confirms that it is a distributor for numerous Dell Products.

      d.     Emtec Federal, Inc., 26A Eastmans Road, Parsippany, NJ, 07054.[25]

43.    Under the Teaming Agreements between Dell Federal and other ADMC2 awardees who were Defendants' Teaming Partners, the awardees were allowed to initially offer the products of Dell's competitors.  However, under the exclusivity clause, they were required to use Dell products in the technology refreshments if Dell provided such products.  This restriction on offering competitor products imposed by Defendants, deprived the Government of the amount of competition the Government assumed would be present at the delivery order stage.

44.    Upon information and belief, because the Defendants concealed the Teaming Agreements from the ADMC2 contracting officer, the contracting officer was unaware of their existence, and therefore, the contracting officer was unaware the amount of competition that the Government was expecting on ADMC2 deliver orders was not occurring.

45.    For the ADMC2 delivery orders placed against the Dell Federal prime contract, the location of the false or fraudulent conduct was the Dell Federal's invoicing department where the invoices were sent to the Government.  For the ADMC2 delivery orders placed against the contracts of the Defendants' Teaming

---

https://www.transource.com/store/qsearch_results.asp?criteria=Dell&x=6&y=8
[25] The Emtec, Inc. website confirms that it is a Dell partner.
https://www.emtecinc.com/company/partners/

Partners, the location of the false or fraudulent act was at the address for the Teaming Partner.

46.    The violations set forth in Counts I – VIII as to the ADMC2 contracts occurred during the life of the ADMC2 contracts which commenced on April 24, 2006 and expired on October 23, 2020.

47.    The program maximum authorized by the Office of Management & Budget for ADMC2 is $5.5 billion across all of the contracts including options and ordering is open to Army, DoD, and other Federal Agencies.[26]

**SEWP V**

48.    SEWP V is a GWAC focused on IT products and product-based services. SEWP V offers a wide range of advanced technology including tablets, desktops and servers; IT peripherals; network equipment; storage systems; security tools; software products; cloud-based services; video conferencing systems and other IT and Audio-Visual products. Product-based services such as installation, training, maintenance and warranty are also available through SEWP V.

49.    In February 2013 NASA released it first draft solicitation for SEWP V. Delayed by protests, awards were made in March 2015.

50.    SEWP V has a large pool of competing contractors consisting of over

---

[26] https://www.eis.army.mil/newsroom/news/enterprise-services/admc-2-designated-1-4-best-class-it-contracts-federal-government

25

140 awardees.  In 2018, SEWP V had $4.5 billion in sales.

51.    Below is an extract from a Dell Federal Teaming Agreement tailored for a competition to select contractors to be included on a SEWP V Agency Catalog[27] established to meet the requirements of the Department of State.[28]  The Teaming Agreement version is dated April 1, 2017:

> 1. Exclusivity
>
> a. Prime
>
> i. Proposal Phase. Solely in response to the Solicitation, including any amendments thereto, and subject to the termination provisions in Section 4 below, Prime agrees
>
> > (1) Not to participate in other Program proposal undertakings competitive to the Team's effort; and
> > (2) For Solicitation CLINS where a Dell Product meets the Solicitation's technical and reasonable delivery requirements ("Dell Compliant Solution"), Prime shall offer Dell Compliant Solutions exclusively. If there is no Dell Compliant Solution available from Dell, Prime may propose competing product(s). In the event a Dell Compliant Solution subsequently becomes available, Prime agrees to substitute the Dell Compliant Solution for the competing product(s) provided Prime has a reasonable opportunity to do so.
> > (3) Evaluation and Testing Equipment: Prime, at their expense, shall provide all evaluation units to the

---

[27]  For more information on BOAs see FAR § 16.703.

[28] Agency Catalogs are second-tier contracts awarded on a competitive basis to SEWP contract holders that enable those Agency Catalog holders to provide goods and services specifically required by the agency establishing the catalog.

Government for product acceptance testing for the purpose of evaluating and verifying the products proposed and when any new product changes are released.

ii. Program Contract Performance. In the event Prime is awarded a Program Contract, during the term of said Program Contract including any extensions thereof, for Program Contract CLINS where there is a Dell Compliant Solution available, Prime shall

(1) Only offer Dell Compliant Solutions same for sale under said CLINS. In the event Dell does not have a Dell Compliant Solution, Prime may offer for sale and/or sell a competing product(s) during the time there is no Dell Compliant Solution available. **In the event a Dell Compliant Solution subsequently becomes available, Prime agrees to cease offering the competing product for sale and offer only Dell Compliant Solutions**, but may fulfill any orders for competing products received from the DOS during the time of Dell Compliant Solution non-availability;

Exhibit 2, at page 1-2 (emphasis added).

52.    Additionally, below is an extract from another Dell Federal Teaming Agreement for SEWP V.  This tailored Teaming Agreement is for an Agency Catalog established to meet the requirements of the Department of Justice Bureau of Prisons:

1. Exclusivity

a. Prime

i. Proposal Phase. Solely in response to the Solicitation, including any amendments thereto, and subject to the termination provisions in Section 4 below, Prime agrees

(1) Not to participate in other Program proposal undertakings competitive to the Team's effort; and

(2) For Solicitation CLINS where a Dell Product meets the Solicitation's technical and reasonable delivery requirements ("Dell Compliant Solution"), Prime shall offer Dell Compliant Solutions exclusively. If there is no Dell Compliant Solution available from Dell, Prime may propose competing product(s). In the event a Dell Compliant Solution subsequently becomes available, Prime agrees to substitute the Dell Compliant Solution for the competing product(s) provided Prime has a reasonable opportunity to do so.

ii. Program Contract Performance. In the event Prime is awarded a Program Contract, during the term of said Program Contract including any extensions thereof, for Program Contract CLINS where there is a Dell Compliant Solution available, Prime shall

(1) Only offer Dell Compliant Solutions same for sale under said CLINS. In the event Dell does not have a Dell Compliant Solution, Prime may offer for sale and/or sell a competing product(s) during the time there is no Dell Compliant Solution available. **In the event a Dell Compliant Solution subsequently becomes available, Prime agrees to cease offering the competing product for sale and offer only Dell Compliant Solutions**, but may fulfill any orders for competing products received from the BOP during the time of Dell Compliant Solution non-availability;

Exhibit 3, at page 1-2 (emphasis added).

53.    Upon information and belief, Defendants' Teaming Partners signed Dell Federal Teaming Agreements similar to the ones in Exhibits 2 and 3.  Under the Dell Federal Teaming Agreements tailored for SEWP V, as set forth in Exhibits 2 and 3, the Teaming Partners could only offer Dell IP products if comparable Dell products were available.  These Teaming Agreements were made after the Government issued the SEWP V contracts, so any Teaming Partner who was awarded a SEWP V contract had to cease offering products of Dell's competitors in order to comply with Dell's terms.  Using its monopolistic power over the commercial sales of IT to federal agencies, Dell coerced the Teaming Partners to sign such agreements since it was the only way to obtain Dell's Program-preferred pricing which allowed the Teaming Partner to be price competitive for sales on the SEWP V contract.

54.    The Teaming Partners had little or no leverage to negotiate the teaming agreements, rendering the Teaming Partners as victims of Defendants to a certain degree in that, even though the Teaming Partners submitted false claims for payment on the SEWP V contract as a result of signing the Teaming Agreements, Defendants caused them to submit such false claims.

55.    The following are among the Defendants' Teaming Partners with SEWP V contracts:

A.    CDW-G Corporation, 200 N. Milwaukee, Avenue, Vernon Hills,

IL 60061.[29]

B.   Blue Technologies, Inc., 5885 Grant Avenue, Cleveland, OH 44105.[30]

C.   Iron Bow Technologies, Inc., 2303 Dulles Station Boulevard, Suite 400, Herndon, VA 20171.[31]

56.   The graphic below on Government spending on SEWP V was prepared by GovWin, a leading source of marketing information of Federal procurements:[32]



The above graph provides a strong inference that Dell Federal has presented for payment invoices in excess of $100,000,000, and that Defendants' Teaming Partner, CDW presented for payment invoices in excess of $250,000,000.

---

[29]   CDW-G's web site confirms that it is a distributor of Dell Products.
https://www.cdwg.com/content/cdwg/en/brand/dell-emc-interstitial.html?enkwrd=DELL&key=DELL
[30]   For a link to Blue Technologies' web site showing it is a "partner" with Dell see
https://bluetech.com/partners/
[31]   For a link to Iron Bow Technologies' web site showing Dell is a strategic partner, see
https://ironbow.com/strategic-partners/
[32]   See https://iq.govwin.com/neo/marketAnalysis/view/NASA-SEWP-Continues-to-Grow-after-25-Years/3389?researchTypeId=1&researchMarket=

57.    Because Defendants concealed the Teaming Agreements from the SEWP V contracting officer, the contracting officer was unaware that the amount of competition that the Government was expecting on SEWP V deliver orders was not occurring.

58.    For the SEWP V delivery orders placed against the Dell Federal prime contract, the location of the false or fraudulent conduct was the Dell Federal's invoicing department where the invoices were sent to the Government.  For the SEWP V delivery orders placed against the contracts of the Defendants' Teaming Partners, the location of the false or fraudulent act was at the address for the Teaming Partner.

59.    The violations set forth in Counts I – VIII as to the SEWP V contracts occurred during the life of the contracts which commenced with agencies placing delivery orders being in 2015 and continuing at this time.

60.    The maximum contract value for SEWP V is $20 billion.[33]

**D.    Defendants Teaming Partners' GSA's MAS Schedule 70 Contracts**

61.    GSA's largest schedule category is 70 for information technology. Schedule 70 is a GWAC that offers a comprehensive array of state-of-the-art IT products, services, and solutions.  Approximately 80 percent of IT Schedule 70

---

[33]  https://www.nasa.gov/press/2015/april/nasa-awards-information-technology-contracts-to-118-small-disadvantaged-businesses

contract holders are small businesses.

62.     Federal agencies have socio-economic goals to meet when spending appropriated funds.[34]

63.     To meet socio-economic goals, agencies frequently acquire information technology under GSA Schedule 70 from small businesses rather through Original Equipment Manufacturers ("OEMs") such as Defendants.

64.     A small business GSA Schedule 70 contract awardee who seeks to sell a manufacturer's products on GSA must first obtain a Letter of Supply (LoS) from that manufacturer and provide that LoS to GSA prior to adding those products to their Schedule contract offerings.  Upon information and belief, any Schedule 70 contract holder hoping to obtain a Dell LoS must enter into a Teaming Agreement requiring it to sell exclusively Dell products and to replace any previously offered competing products with Dell offerings whenever possible, not unlike the teaming agreements in Exhibits 1, 2, and 3.  This restriction on offering competitor products imposed by Defendants, deprived the Government of the amount of competition at the information technology component level when relying on a small business to meet the information technology needs set forth in the delivery order.

65.     The Defendants have unlawfully reduced competition among GSA

---

[34]  A copy of the goals listed by agency can be found at https://www.sba.gov/sites/default/files/2019-05/FY19PrimeSUBFinalGoals_1.pdf

Schedule 70 delivery order competitions by precluding the IT products of rival manufacturers. The reduced competition allows Defendants to quote higher prices for Dell products than would otherwise have been quoted but for the reduced competition.

66.    Because Defendants concealed the Teaming Agreements from the GSA Schedule 70 contracting officer, the contracting officer was and remains unaware that the amount of competition for GSA Schedule 70 deliver orders is less than the Government expected.

67.    For GSA Schedule 70 delivery orders placed against the contracts of the Defendants' Teaming Partners, the location of the false or fraudulent act was at the address for the Teaming Partner.

### E.    Summary of Conduct of Defendants and Defendants Teaming Partners on GWACs Culminating in Violations of False Claims Act

68.    Defendants engaged in a pattern and practice of collusive bidding and reducing competition on the GWACs by using Teaming Agreements that restricted awardees from using non-Dell products. By doing so, Defendants were able to charge higher prices than they would have otherwise received.

69.    Upon information and belief, Defendants are aware of this illegal conduct but have not repaid any of the fraudulent reimbursements they obtained from the Government on GWACS.

70.    Because of Defendants' actions, numerous claims for reimbursement on the GWACs have been paid because Defendants and Defendants' Teaming Partners caused to be made false and fraudulent vouchers as alleged in Counts I-VIII.

71.    Had the Government known of Defendants' Teaming Agreements and collusive bidding, it would not have given GWACs awards to Defendants or other awardees who had a Teaming Agreement with Dell Federal, and/or it would not have reimbursed Defendants for GWAC IT products.  To do so would put the Government in the position of funding fraudulent government contracting practices.

72.    Further, Defendants' fraudulent conduct "tainted" every GWAC award to Defendants and Defendants' Teaming Partners.  This resulted in payment of government money to Defendants and/or Defendants' Teaming Partners.  Therefore, the "tainted" awards render any and all of the Defendants' and Defendants' Teaming Partners requests for payments Partners under the GWACs as false or fraudulent, violating the False Claims Act.[35]

**F.    Attempted Monopolization of Market for Federal IT GWACs With "Reserves" Awards.**

73.    Many GWACs contain set-aside awards pursuant to FAR § 19.000,

---

[35] *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-44 (1943) (superseded by statute on other grounds, P.L. 78-213, 57 Stat. 608, 609 (1943)); *see also U.S. v. Incorporated Village of Island Park*, 888 F.Supp. 419 (E.D.N.Y. 1995).

meaning that only small businesses are eligible to win a certain percentage or number of the contracts awarded under the base contract.

74.    Conversely, certain GWACs, including the ITES 4H and the ADMC3 contracts, include "reserves" under which the Government ***evaluates all competitive bids against each other*** and may award one or more contracts to small businesses at its discretion pursuant to FAR § 19.503.[36]  If no small businesses have competitive

---

[36] Under FAR § 19.503, the Government may, at its discretion "when conducting multiple award procurements using full and open competition, reserve one or more contract awards" when a total or partial set-aside is not feasible. *See also* 15 U.S.C. § 644(r)(3) (2020), clarifying that the government may "at their discretion, reserve 1 or more contract awards for small business concerns under full and open multiple award procurements." Such acquisitions are clearly not "set aside" contracts as specified in FAR 19.501(a)(1).  The following is a more formal explanation of reserve:

> 3. Reserve one or more awards for small business on multiple-award contracts that are established through full and open competition ( i.e., not totally or partially set aside).
> The use of reserves is expected to increase opportunities for small business. Reserves allow small business concerns to have a "seat at the table" for multiple-award contracts in the absence of other acquisition strategies ( e.g., total or partial set-asides) that would have guaranteed opportunity for small business concerns.

> In addition, this rule is expected to benefit small business by removing the current requirement for small business offerors to submit an offer for both the set-aside and non-set-aside portions of a partial set-aside. That requirement was burdensome for small business concerns looking to perform only the set-aside portion(s). This final rule allows small business offerors to submit an offer for only the set-aside portion if they are only interested in performing that portion. By allowing small business offerors to only submit an offer for the set-aside portion, the Government is expected to have fewer proposals to evaluate for the non-set-aside portion of the solicitation, which would result in a reduction in burden. However, there may be additional proposals received on the set-aside portion of the solicitation from offerors that previously did not submit a proposal for the requirement because they would have had to submit a proposal for all portions of the solicitation.

> ***

> The rule provides contracting officers with the authority to issue orders directly to a small business under a reserve, which will increase opportunities for small business concerns awarded a contract under a multiple-award contract reserve but will result in lost opportunity for the other contractors with awards on the multiple-award contract.

prices, all available contract awards may be awarded to large businesses such as Defendants. For example, the ITES-4H contract allows the Government to award **up to** seven contracts to small businesses after assessing all competitive bids, but there is no guarantee that small businesses will be awarded any contracts under the ITES-4H.

75.    Because small business pricing is evaluated against prices offered by large businesses to determine whether any small business awards will be made, Defendant competes directly with small businesses for the available contract awards. Thus, unlike the fully set-aside GWACs, Defendants are horizontal competitors with the small businesses who hope to earn a "reserves" contract award.

76.    This presents a circumstance in which Defendants horizontally compete against their own Teaming Partners which, through operation of Teaming Agreements, may only offer Dell Products.  The Teaming Partner's costs for these products are, in turn, set by Defendant – their direct competitor – all but guaranteeing the Teaming Partners' bids on the "reserves" award GWACs will be higher than Defendants'. The result is that the Teaming Partners are once again converted into *de facto* Dell proxies, and Defendants' conduct has led to both illusory competition and increased prices paid by the Government over time with respect to the "reserves"

---

FAC 2005-54 under FAR Case 2011-024, 85 FR 11746, February 27, 2020.

award GWACs. Upon information and belief, many of the small businesses bidding on the "reserves" award GWACs are Teaming Partners subject to the Teaming Agreements.

77.  As is the case with the GWACs discussed above, the Teaming Agreements' restriction on offering competitor products on the Federal IT "reserves" award GWACs deprived the Government of a significant measure of competition the Government assumed would be present at the delivery order stage, fraudulently causing the Government to believe the competition had achieved a higher level of available product diversity than was actually the case.

78.  Defendants have unlawfully reduced competition in the market for Federal IT GWACs containing "reserves" awards by using Teaming Agreements, which precluded the IT products of rival manufacturers, while at the same time competing directly with the Teaming Partners and other small businesses. The reduced competition allowed Defendants to quote higher prices for Dell Products than would otherwise have been quoted but for the reduced competition and allowed them to outbid their competitors because of the use of the Teaming Agreements.

79.  Because Defendants concealed the Teaming Agreements from the contracting officers for the "reserves" award GWACs, the contracting officers were and remain unaware that the amount of competition for the "reserves" award Federal IT GWAC deliver orders is significantly less than the Government expected.

80.    The practical effect of Defendants' conduct is that they are utilizing a dual distribution model (horizontally competing with the Teaming Partners and small businesses on the "reserves" award GWACs while controlling the products the Teaming Partners sell, and the prices at which they sell them) in an attempt to unilaterally monopolize the market for Federal IT GWACs that contain "reserves" awards. Upon information and belief, combining both Defendants' direct sales and the sale of Dell Products through distributors and resellers under these GWACs, Defendants occupy over 50% of this market. This violates Sherman Act, 15 U.S.C. § 2.

**COUNT ONE**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. §§ 3729 *et seq.*)**
**– FALSE CERTIFICATION OF COMPLIANCE WITH THE SHERMAN**
**ACT**

81.    Relator re-alleges and incorporates paragraphs 1-80 of the Complaint as if fully set forth herein.

82.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States on delivered Dell Products by conspiring with GWAC contract awardees to reduce competition on delivery orders through restrictive Teaming Agreements.

83.    The Defendants had knowledge that the claims were fraudulent.

84.    As to the Sherman Act violation, 15 U.S.C. § 1: Defendant Dell Federal,

as a subsidiary and agency for Dell, entered into Teaming Agreements with awardees of the GWACs.

85.   The Teaming Agreements were an unreasonable restraint on trade which frustrated the Government from achieving its statutory duty to "obtain full and open competition through the use of competitive procedures." 10 U.S.C. § 2304(a)(1)(A).

86.   The purpose of the Teaming Agreements is to exclude competing products from being available to the Government, a practice that is anti-competitive, and therefore should be evaluated as a *per se* violation of the Sherman Act.

87.   The Teaming Agreements affected interstate commerce.

88.   Compliance with the Sherman Act was an implied condition of payment of invoices on the GWACs.

89.   The Defendants making or causing to be made fraudulent claims for payments for delivered Dell Products when the condition of payment had not been met (*e.g.*, compliance with the Sherman Act) constituted a material false certification under the False Claims Act.  The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products.  Moreover, payments such as those documented in paragraphs 28 and 53, *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

90.    The Defendants had knowledge that the claims were false or fraudulent.

91.    Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

92.    Defendants fraudulently invoiced or caused to be invoiced payments from the Government for Defendants' IT products under the GWACs. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, plus a civil penalty for each violation.

93.    As a result of Defendants' False Claims Act violations stemming from implied false certifications based on their breach of the Sherman Act, the United States has incurred damages in an amount to be determined at trial

### COUNT TWO
### FEDERAL FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. §§ 3729 *et seq.*) – FALSE CERTIFICATION OF COMPLIANCE WITH THE CLAYTON ACT

94.    Relator re-alleges and incorporates paragraphs 1-93 of the Complaint as if fully set forth herein.

95.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States on delivered Dell Products by conspiring with GWAC awardees to reduce competition on delivery

orders through restrictive Teaming Agreements.

96.    The Defendants had knowledge that the claims were fraudulent.

97.    As to the Clayton Act violation, 15 U.S.C. §§ 12-27: Defendant Dell Federal, as a subsidiary and agency for Dell, entered into Teaming Agreements with some of the awardees of the GWACs.

98.    A condition of the Teaming Agreements was that the other GWAC awardees who entered into them were to refuse to deal with Defendants' competitors when implementing technology refreshments, and instead only offer Dell products if Dell products were available for the refreshment. The Teaming Agreements collectively allowed Defendants to affect the IT product prices sold in delivery orders on the GWACs, having as an effect the substantial lessening of competition in federal IT sales

99.    Compliance with the Clayton Act was an implied condition of payment of invoices under the GWACs.

100.    The Defendants making or causing to be made fraudulent claims for payments for delivered Dell Products when the condition of payment had not been met (*e.g.*, compliance with the Clayton Act) constituted a material false certification under the False Claims Act. The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products. Moreover, payments such as those documented in paragraphs 28 and 53, *supra* can

only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

101.   The Defendants had knowledge that the claims were false or fraudulent.

102.   Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

103.   Defendants fraudulently invoiced for or caused to be invoiced false or fraudulent claims upon which Defendants received payments. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, plus a civil penalty for each violation.

104.   As a result of Defendants' FCA violations stemming from implied false certifications based on the breach of the Clayton Act, the United States has incurred damages in an amount to be determined at trial.

### COUNT THREE
**FEDERAL FALSE CLAIMS ACT VIOLATION (31 U.S.C. §§ 3729(a)(1)(C))
CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT**

105.   Relator re-alleges and incorporates paragraphs 1-104 of the Complaint as if fully set forth herein.

106.   Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result Dell Federal conspiring with awardees of

42

GWACs to reduce competition on delivery orders.

107.   The Defendants had knowledge that the claims were fraudulent.

108.   As to the conspiracy to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(C): Defendant Dell Federal conspired with one or more GWAC awardees to defraud the United States by removing the IT products of other OEMs from competing on delivery orders under the GWACs.

109.   Defendant Dell Federal, by providing Dell's Program-preferred pricing enticed Defendants' Teaming Partners to enter into Teaming Agreements such as those set forth in Exhibits 1-3.  Thus, the Defendants and Defendants' Teaming Partners acted in a manner to achieve the object of the conspiracy. The Teaming Agreements collectively allowed Defendants to affect the prices of IT Products sold in delivery orders on GWACs in a matter that was harmful to the United States.

110.   The actual presentation of claims for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products. Moreover, payments such as those documented in paragraphs 28 and 53, *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

111.   The Defendants had knowledge that the claims were false or fraudulent.

112.   As a result of Defendants' False Claims Act violations stemming from implied false certifications, the United States has incurred damages in an amount to

be determined at trial.

113.   Defendants' course of conduct constituted a conspiracy to engage in collusive bidding in violation of the False Claims, 31 U.S.C. § 3729(a)(1)(C).

**COUNT FOUR**
**FEDERAL FALSE CLAIMS ACT VIOLATION – IMPLIED FALSE CERTIFICATION REGULATORY AND CONTRACTUAL VIOLATION OF FAR § 52.244-5 "COMPETITION IN SUBCONTRACTING CLAUSE (DEC 1996) AS WELL AS FAR § 44.201-1"**

114.   Relator re-alleges and incorporates paragraphs 1-113 of the Complaint as if fully set forth herein.

115.   Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result Dell Federal conspiring with GWAC awardees to reduce competition on delivery orders.

116.   The Defendants had knowledge that the claims were fraudulent.

117.   The GWAC contracts incorporated by reference FAR § 52.244-5 Competition in Subcontracting (DEC 1996).  Specifically, the ADMC2 contracts contained a 52.244-5 clause.  In instances where the GWAC contracts did not expressly included the FAR § 52.244-5 clause, the clause was placed into the GWAC contract by operation of law (*e.g.*, the Christian Doctrine).  Moreover, but for Defendants' deception of concerning teaming agreements such as those in Exhibits 1-3, the contracting officers would have deemed a lack of adequate price competition and inserted the clause pursuant to FAR § 44.204(c).

118.  The FAR § 52.244-5 Competition in Subcontracting states, in part: "[t]he Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."  FAR § 44.201-1 requires contracting officer approval of subcontracts in excess of the simplified acquisition threshold for fixed price contacts where the contractor does not have an approved purchasing system.  On information and belief, the Defendants did not have an approved purchasing system.

119.  The FAR § 52.244-5 Competition in Subcontracting required the GWAC awardees, when performing technology refreshment, to select replacement products "on a competitive basis to the maximum practical extent." *Id.*

120.  The GWAC awardees who signed Dell Federal Teaming Agreements such as those in Exhibits 1, 2, and 3 breached their obligations under the FAR § 52.244-5 Competition in Subcontracting clause and FAR § 44.201-1 in order to comply with the terms of the Dell Federal teaming agreement.

121.  Dell Federal breached its obligations under the FAR § 52.244-5 Competition in Subcontracting clause and FAR § 44.201-1 when performing technology refreshments by not selecting replacement products "on a competitive basis to the maximum practical extent." *Id.*

122.  Compliance with the FAR § 52.244-5 Competition in Subcontracting clause and FAR § 44.201-1 were an implied condition of payment of invoices under

the GWACs.

123.   The Defendants made or caused to be made fraudulent of false claims for payments for delivered Dell Products when this condition of payment had not been met (*e.g.*, compliance the FAR § 52.244-5 Competition in Subcontracting clause and FAR § 44.201-1).  The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products. Moreover, payments such as those documented in paragraphs 28 and 53,  *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

124.   Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

125.   As a result of Defendants' False Claims Act violations stemming from implied false certifications based on breach of the FAR § 52.244-5 Competition in Subcontracting clause and FAR § 44.201-1, the United States has incurred damages in an amount to be determined at trial.

## COUNT FIVE

### FEDERAL FALSE CLAIMS ACT VIOLATION – IMPLIED FALSE CERTIFICATION --REGULATORY AND CONTRACTUAL VIOLATION OF THE TECHNOLOGY REFRESHMENT CLAUSE

126.   Relator re-alleges and incorporates paragraphs 1-125 of the Complaint as if fully set forth herein.

127.   Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result of Dell Federal conspiring with awardees of the GWACs to reduce competition on delivery orders.

128.   The Defendants had knowledge that the claims were fraudulent.

129.   The GWACs contained a Technology Refreshment clause or equivalent clause.

130.   The Technology Refreshment clauses (or equivalent clauses) in the GWACs require awardees to replace products when directed by the government or when they become obsolete.

131.   The GWAC awardees who signed Dell Federal Teaming Agreements such as those in Exhibits 1-3 breached their obligations under the Technology Refreshment clause (or comparable clause) by agreeing to replace even non-obsolete products made by other manufacturers with exclusively those manufactured by Dell.

132.   Compliance with the Technology Refreshment clause (or comparable clause) was an implied condition of payment of invoices.

133.   The Defendants made or caused to be made false or fraudulent claims for payments for delivered Dell Products because an implied condition of payment had not been met (*e.g.*, compliance with the Technology Refreshment clause or equivalent).   The actual presentation for payment is apparent from the invoicing

practice which are the trade usage of GWAC contracts for IT products. Moreover, payments such as those documented in paragraphs 28 and 53, *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

134.    The Defendants had knowledge that the claims were false or fraudulent.

135.    Defendants' breaches of the Technology Refreshment Clauses (or equivalents) constituted violations of the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

136.    As a result of Defendants' False Claims Act violations stemming from implied false certifications based on breach of the Technology Refreshment Clause (or equivalent), the United States has incurred damages in an amount to be determined at trial.

**COUNT SIX**
**FEDERAL FALSE CLAIMS ACT VIOLATION – IMPLIED**
**FALSE CERTIFICATION - VIOLATION OF ANTI-KICKBACK**
**ACT AND FAR § 52.203-7 IN THE ROLE OF DEFENDANTS**
**BEING PRIME CONTRACTORS AND THE GWAC TEAMING**
**PARTNERS BEING SUBCONTRACTS**

137.    Relator re-alleges and incorporates paragraphs 1-136 of the Complaint as if fully set forth herein.

138.    The Anti-Kickback Act is located at 41 U.S.C. § 8702. "Congress substantially rewrote the statute in 1986 with the express purpose of extending the

scope of the statute to any commercial bribery occurring anywhere within the federal procurement system." *United States v. Purdy*, 144 F.3d 241, 244 (2nd Cir. 1998).

139. "Although the quintessential kickback situation involves a subcontractor making payments to a prime contractor, the Anti-Kickback Act's coverage is not so limited. For example, in *United States v. Dynamics Research Corp.*, the court found a prime contractor liable when its employees received kickbacks from other prime contractors in exchange for causing the Air Force to pay inflated prices for the other contractors' goods and services." Government Contract Costs & Pricing, § 91.24 *Anti-Kickback Case Law Interpretation*.

140. Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result of Dell Federal conspiring with other GWAC awardees to reduce competition on delivery orders. The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products. Moreover, payments such as those documented in paragraphs 28 and 53 *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

141. The Defendants had knowledge that the claims were false or fraudulent.

142. 41 U.S.C. § 8702 and FAR § 52.203-7 both prohibit prime contractors from providing or accepting kickbacks on a contract with the Federal Government. FAR § 52.203-7 defines a kickback to mean "any money, fee, commission, credit,

gift, gratuity, thing of value, or compensation of any kind which is provided to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

143.   Specifically, FAR § 52.203-7(b)(1)-(3) prohibits any person from: "(1) Providing or attempting to provide or offering to provide any kickback; (2) Soliciting, accepting, or attempting to accept any kickback; or (3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor."

144.   Here the kickbacks were in the form of "Dell's Program-preferred pricing" as set forth in teaming agreements such as those in Exhibits 1-3.   These kickbacks in the form of "Dell's Program-preferred pricing" allowed Defendants' Teaming Partners to gain millions of dollars in revenue from GWAC contracts.

145.   Compliance with 41 U.S.C. § 8702 and FAR § 52.203-7 was an implied condition of payment of invoices.

146.   The Defendants made or caused to be made false and fraudulent claims for payments for delivered Dell Products when the implied condition of payment had not been met (*e.g.*, compliance with 41 U.S.C. § 8702 and FAR § 52.203-7).

Such conduct constituted an implied false certification under the False Claims Act.

147.    Defendant Dell Federal provided kickbacks as a prime contractor on the GWACs by giving more favorable pricing to one or more GWAC awardees who entered into Teaming Agreements with Dell Federal.  The Teaming Agreements collectively allowed Defendants to benefit both from Defendant's own prime contracts and from the sales awarded to each Teaming Partner, improperly multiplying its market share and affecting the prices of IT Products sold in delivery orders on GWACs in a matter that was harmful to the United States.

148.    Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

149.    As a result of Defendants' False Claims Act violations stemming from implied false certifications regarding compliance with applicable anti-kickback laws, the United States has incurred damages in an amount to be determined at trial.[37]

### COUNT SEVEN
### FEDERAL FALSE CLAIMS ACT VIOLATION – IMPLIED FALSE CERTIFICATION - VIOLATION OF ANTI-KICKBACK ACT AND FAR § 52.203-7 IN THE ROLE OF DEFENDANTS BEING SUBCONTRACTORS TO DEFENDANTS' GWAC TEAMING PARTNERS WHO WERE PRIME CONTRACTORS

150.    Relator re-alleges and incorporates paragraphs 1-149 of the Complaint as if fully set forth herein.

---

[37] The Anti-Kickback Act did not preempt remedies available to the United States under the False Claims Act.  *United States v. General Dynamics Corporation*, 19 F.3d 770 (2nd Cir. 1994).

151.   Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result of Dell Federal conspiring with awardees of the GWACs to reduce competition on delivery orders.   The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products.   Moreover, payments such as those documented in paragraphs 28 and 53 *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

152.   The Defendants had knowledge that the claims were false or fraudulent.

153.   41 U.S.C. § 8702 and FAR § 52.203-7 both prohibit subcontractors from providing or accepting kickbacks on a contract with the Federal Government. FAR § 52.203-7 defines a kickback to mean "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

154.   Specifically, FAR § 52.203-7(b)(1)-(3) prohibits any person from: "(1) Providing or attempting to provide or offering to provide any kickback; (2) Soliciting, accepting, or attempting to accept any kickback; or (3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime

Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor."

155.   Compliance with 41 U.S.C. § 8702 and FAR § 52.203-7 was an implied condition of payment of invoices.

156.   The Defendants made or caused to be made false and fraudulent claims for payments for delivered Dell Products when the implied condition of payment had not been met (*e.g.*, compliance with 41 U.S.C. § 8702 and FAR § 52.203-7). Such conduct constituted an implied false certification under the False Claims Act.

157.   Defendants paid to their Teaming Partners a subcontractor kickback because the Teaming Agreements provided reduced pricing in exchange for requiring prime contractors awarded GWACs to only offer Dell products upon technology refreshment, allowing Defendants to benefit both from Defendant's own prime contracts and from the sales awarded to each Teaming Partner, improperly multiplying its market share and affecting the prices of IT Products sold in delivery orders on GWACs in a matter that was harmful to the United States.

158.   Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

159.   As a result of Defendants' False Claims Act violations stemming from implied false certifications regarding compliance with applicable anti-kickback

laws, the United States has incurred damages in an amount to be determined at trial.[38]

## COUNT EIGHT
## FEDERAL FALSE CLAIMS ACT VIOLATION – FRAUD IN THE INDUCEMENT

160.   Relator re-alleges and incorporates paragraphs 1-159 of the Complaint as if fully set forth herein.

161.   Defendants made, or caused to be made, fraudulent claims for payments on delivered Dell Products as a result of Dell Federal conspiring with awardees of the GWACs to reduce competition on delivery orders.   The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products.   Moreover, payments such as those documented in paragraphs 28 and 53, *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

162.   The Defendants had knowledge that the claims were false or fraudulent.

163.   Defendants' fraudulent efforts to obtain the GWACs, constitute fraud in the inducement, and render all subsequent claims for payment under the contracts false or fraudulent.   Had the government known of Defendant's intent to deprive the government of the availability of competing products through the use of Teaming

---

[38] The Anti-Kickback Act does not preempt remedies available to the United States under the False Claims Act.  *United States v. General Dynamics Corporation*, 19 F.3d 770 (2nd Cir. 1994).

Agreements requiring replacement of competing products, the government would not have awarded contracts to Defendants or its Teaming Partners.

164.   Defendants' fraud in the inducement to award GWACs and delivery orders under GWACs constituted violations of the False Claims Act.

165.   Defendants fraudulently billed for and received payment from the Government for its IT products under the GWACs.  By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, plus a civil penalty for each violation.

166.   As a result of Defendants' False Claims Act violations stemming from their fraudulent inducements, the United States has incurred damages in an amount to be determined at trial.

**COUNT NINE**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. §§ 3729 *et seq.*)**
**– FALSE CERTIFICATION OF COMPLIANCE WITH THE SHERMAN**
**ACT 15 U.S.C. § 2**

167.   Relator re-alleges and incorporates paragraphs 1-166 of the Complaint as if fully set forth herein.

168.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States on delivered Dell Products while attempting to unilaterally monopolize the market for Federal IT "reserves" award GWACs and reduce competition on delivery orders through

restrictive Teaming Agreements.

169.   A GWAC is awarded to multiple offerors who then compete to win subsequent task orders.  A GWAC competition is "set aside" or "partially set aside" for Small Business participation when non-small businesses are ineligible for some or all of the expected awards.  However, the Government "reserves" a GWAC pursuant to FAR 19.503 when contracting personnel do not believe Small Businesses can provide the required goods or services at market-competitive prices, but nevertheless expect to  award some contracts to eligible small businesses if any are found technically compliant.

170.   As to the Sherman Act violation, 15 U.S.C. § 2: Defendant Dell Federal, as a subsidiary and agency for Dell, was a horizontal competitor on the Federal IT "reserves" award GWACs with small businesses and the Teaming Partners with which it entered into Teaming Agreements.

171.   One of the subcategories of the Sherman Act, Section 2 the Defendants violated involves dual distribution. The following is an explanation of dual distribution from a scholarly source:

> The term dual distribution generally refers to a manufacturer's or wholesale supplier's decision to market goods using both independent distributors and its own distribution system. The manufacturer/supplier's own distribution system may involve direct selling; company facilities at the wholesale and/or retail levels; sales representatives; or other devices. It may be accomplished through subsidiaries, internal divisions with sales responsibilities or without

significant intra-company differentiation, and/or agents.

Legal Aspects of Selling and Buying (3d ed.), Section § 8:1 *What is Dual*

*Distribution*? (June 2021).

172.    In *Graphic Products Distributors, Inc. v. ITEK Corporation*, 717 F.2d

1560 (11th Cir. 1983), the Eleventh Circuit relied upon multiple Supreme Court

decisions to address whether a dual distribution agreement can involve a *per se*

violation of the Sherman Act:

> The Schwinn Court began by stating "we are remitted to an appraisal
> of the market impact of these [restrictive] practices[,]"  id. at 373, 87
> S.Ct. at 1862, but it failed to use economic analysis in distinguishing
> between those restrictive practices it condemned under the per se rule
> and those it found worthy of "rule of reason" treatment. Instead, it
> elevated to prime importance a purely legal distinction between "the
> situation where the manufacturer parts with title, dominion, or risk with
> respect to the article, and where he completely retains ownership and
> risk of loss." Id. at 378–79, 87 S.Ct. at 1865.

> The Schwinn Court held that where a manufacturer sells products to a
> wholesale distributor subject to territorial or customer restrictions upon
> resale, or places similar restraints upon the retailers to which the goods
> are sold, its conduct is per se unreasonable. It did not analyze market
> impact; it merely concluded "[s]uch restraints are so obviously
> destructive of competition that their mere existence is enough." Id. at
> 379, 87 S.Ct. at 1865. On the other hand, **where the manufacturer
> retains ownership and the risk of loss, the more flexible rule of
> reason would apply**. The Court then upheld that portion of the lower
> court's opinion which found territorial allocation and franchising of
> retailers reasonable where agency or consignment arrangements alone
> were involved, and title to the goods did not pass.

*Id*. at 1566-67 (Emphasis added).

173.   Concerning how Defendants do business with their Teaming Partners, the Defendants require the Teaming Partners to promptly pay for all deliveries, thus placing the risk of loss on the Teaming Partners.   Accordingly, applying *Graphic Products Distributors, Inc. v. ITEK Corporation*, the Defendants' use of the dual distribution model in an attempt to unilaterally monopolize the relevant market in this case constitutes a *per se* violation of the Sherman Act.

174.   Indeed, the Defendants have engaged in anticompetitive conduct in attempting to unilaterally monopolize the market for the Federal IT "reserves" award GWACs by implementing a dual distribution model in which they were horizontal competitors on the "reserves" award GWACs with the Teaming Partners and other small businesses, while at the same time using the Teaming Agreements to control the products and prices the Teaming Partners could offer.

175.   Defendants intended to unilaterally monopolize the market for Federal IT GWACs containing "reserves" awards, as evidenced by the Teaming Agreements.

176.   Defendants rendered themselves horizontal competitors on the Federal IT "reserves" award GWACs with the Teaming Partners and other small businesses through their attempted monopolization, and therefore their conduct should be evaluated as a *per se* violation of the Sherman Act, Section 2. *US v. Brewbaker*, 2021 WL 1011046, at *12 (E.D.N.C March 16, 2021).

177.   Defendants' attempted unilateral monopolization presents a dangerous probability of Defendants achieving monopoly power in the market for Federal IT GWACs containing "reserves" awards. Defendants have a dangerous probability of achieving monopoly power since they have a market share of over 50% in the market for Federal IT GWACs containing "reserves" awards. *See McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1506, *reh'g denied,* 865 F.2d 1274 (11th Cir. 1988).

178.   As stated above, the relevant market to assess Defendants' conduct regarding the  Sherman Act, Section 2 is the market for Federal IT GWACs containing "reserves" awards.[39] This market definition makes sense because of the stark differences in the federal and commercial markets for IT contracts. Specifically, (1) almost all contractors that have both federal and commercial sales teams differentiate between the two; (2) many companies, such as Defendants, establish entire subsidiaries solely to handle federal contracting; (3) pricing can be either higher or lower between federal and commercial contracts for the same products depending on the circumstances; (4) in many cases inventory for federal

---

[39] The following contracts are some of the largest recent IT GWAC contracts, and are known or reasonably suspected to include small business reserves such that the Government may elect to award to many or no small businesses, placing small businesses in direct competition with large businesses such as Defendant: IT Enterprise Solutions – 3rd Generation (ITES-3H), awarded in 2013; ITES-4H (Currently open for proposals); Army Desktop and Mobile Computing – 2nd Generation (ADMC-2), closed in September 2020; ADMC-3, in performance since October, 2020, and others.

contract sales must be kept physically separate in warehouses from commercial inventory so companies do not accidentally ship the Government a non-compliant version; (5) FAR regulations govern compliance on federal contracts, whereas the UCC governs commercial contracting compliance; (6) federal contracting consists of vastly different eligibility and certification requirements.

179.   Defendants' attempted unilateral monopolization affected interstate commerce.

180.   Compliance with the Sherman Act, Section 2 was an implied condition of payment of invoices on the Federal IT "reserves" award GWACs. See FAR Subpart 3.3 "Reports of Suspected Antitrust Violations.

181.   The Defendants making or causing to be made fraudulent claims for payments for delivered Dell Products when the condition of payment had not been met (*e.g.*, compliance with the Sherman Act, Section 2) constituted a materially false certification under the False Claims Act.  The actual presentation for payment is apparent from the invoicing practice which are the trade usage of GWAC contracts for IT products.  Moreover, payments such as those documented in paragraphs 73-80, *supra* can only be accomplished by the Defendants and Defendants' Teaming Partners presenting false invoices for payment.

182.   The Defendants had knowledge that the claims were false or fraudulent.

183. Defendants' course of conduct violated the False Claims, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(l)(B).

184. Defendants fraudulently invoiced or caused to be invoiced payments from the Government for Defendants' IT products under the Federal IT "reserves" award GWACs. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, plus a civil penalty for each violation.

185. Based on FAR Subpart 3.3, the agency contracting officers who approved payments would never had approved the payments if they were aware of the Sherman Act violations.

186. As a result of Defendants' False Claims Act violations stemming from implied false certifications based on their breach of the Sherman Act, Section 2, the United States has incurred damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendant as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et*

*seq.* provides;

(b)  That civil penalties at a minimum of $11,665 and a maximum of $23,331—
as adjusted by the Civil Monetary Penalties Inflation Adjustment, 28 C.F.R.
§ 85.5, and all future amendments thereto—be imposed for each and every
false claim that Defendant presented to the United States;

(c)  That pre- and post-judgment interest be awarded, along with reasonable
attorneys' fees, costs, and expenses which the Relator necessarily incurred in
bringing and pressing this case;

(d)  That the Court grant permanent injunctive relief to prevent any recurrence of
the unlawful acts for which redress is sought in this Complaint;

(e)  That the Relator be awarded the maximum percentage of any recovery
allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2); and

(f)  That this Court award such other and further relief as it deems proper.


DATED: October 12, 2022

W. Daniel "Dee" Miles, III #ASB-7656-M75W
C. Lance Gould, AL #ASB-0913-G66C
Tyner D. Helms, AL #ASB-2016-L14E
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama  36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555

Dee.Miles@BeasleyAllen.com
Lance. Gould@BeasleyAllen.com
Tyner.Helms@BeasleyAllen.com

*Attorneys for Plaintiff/Relator*